**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Linton JACOBS, Defendant–Appellant.**

No. 15217.

Missouri Court of Appeals,
Southern District,
Division One.

May 18, 1988.

William L. Webster, Atty. Gen., Carrie Francke, Sp. Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Susan L. Hogan, Columbia, for defendant-appellant.

GREENE, Presiding Judge.

Linton Jacobs was jury convicted of driving while intoxicated, § 577.010 RSMo 1986, as amended, and, after being adjudged by the trial court to be a persistent offender, was sentenced to five years' imprisonment.

On appeal, Jacobs contends that the trial court committed reversible error by holding an ex parte conference during trial with the principal witness for the defense, following which the witness declined to testify further, thus denying defendant's right to a fair trial. We reverse and remand.

The incident that precipitated the filing of the drunken driving charge against Jacobs occurred on October 13, 1986. State's evidence that was sufficient to sustain the conviction was that about 10:15 p.m. on the

date in question, the Sikeston Public Safety Department received a telephone call reporting that a white and yellow car had been driven into a yard on Pam Street in Sikeston, Missouri, and that the driver of the car appeared to be intoxicated. Lieutenant Richard Kreitzburg responded to the call, and found an unoccupied 1973 yellow and white Plymouth automobile parked in a yard. While Kreitzburg was gathering information from members of the neighborhood regarding what they had seen, one of the individuals noticed the Plymouth being backed out of the yard and leaving the area. A high speed chase by Krietzburg followed, during which the driver of the Plymouth ran two stop signs, and finally ran into and totaled a Chevrolet truck that was parked on an adjacent street. The impact stopped the Plymouth.

Kreitzburg, who was in close pursuit, noticed an individual attempting to crawl out the passenger side window and arrested that person who Kreitzburg identified at trial as Jacobs. At the time of arrest, Jacobs' eyes were bloodshot, his speech was slurred, and he had a strong odor of alcohol on his breath. A breathalyzer test was administered to Jacobs which gave a test result of .111 percent, which, in the opinion of the officer who administered the test, showed that Jacobs was legally intoxicated.

Jacobs' principal defense witness at trial was his half-brother, Ronald Staggs. Staggs testified, without objection, that he, and not Jacobs, was driving the 1973 Plymouth during the incident in question. He testified that he was test-driving the car, which was owned by Jacobs, to see if Staggs wanted to buy its engine, which Staggs intended to install in his own car. He testified that during the test drive, the brakes failed, causing the car to run a stop sign. Staggs said that he attempted to stop the car, or slow it down, and, in the process drove through a parking lot and a field and finally hit a truck that was parked on Heath Street. Staggs testified that when he hit the truck, his brother told him to get out of the car as "there was an officer in a police car with his siren on then coming up to the car." As Staggs was

getting out the police car was "maybe a hundred, hundred forty feet away from us." Staggs got out of the passenger side, as the driver's door would not open. Staggs said he stopped by a nearby house and watched the police officer arrest his brother, putting a gun to his head in the process. Staggs explained that the reason he did not come forward and admit responsibility was "I was going to, but when I seen the gun—I don't want no pistol put to my head."

During a lengthy cross-examination by the prosecuting attorney, Staggs said the reason his brother told him to get out of the car was that Jacobs thought Staggs was still on probation for a "BAC" charge, which is an alcohol-related traffic offense. At the conclusion of the cross-examination, the following exchange occurred between the prosecutor and Staggs:

Q. Other than talking to your brother one time in jail, you have not talked to him about this case; right?

A. No, sir, I haven't.

Q. And this is the very first time you have ever testified with regard to anything in this case?

A. Yes, sir.

Q. And you understand what perjury is?

A. Yes, sir.

Q. I want you to think one more time. Everything you're telling is what you want to tell us happened on October 13, 1986?

A. Yes, sir.

At this point in time, the trial judge interjected himself into the proceedings. While we do not wish to burden this opinion unduly by verbatim quotes, we feel that it is necessary in this case due to the gravity of the issue involved. The following recitations tell what happened next.

(The following proceedings were had at the bench, out of the hearing of the jury:)

THE COURT: Mr. Staggs, at this point—I may have waited too late—I probably need to advise you that you have admitted to several rather serious crimes on the record, under oath, to the prosecutor

of the State of Missouri. You may very well have placed yourself in the penitentiary for some significant period of time. You have a Fifth Amendment right. Has anyone discussed this with you?

MR. GAUSNELL: I have discussed it.

THE COURT: So you have been appraised—

MR. GAUSNELL: The only thing I have discussed with him is traffic offenses.

THE COURT: Wait a minute. You said you had discussed his Fifth Amendment rights. Have you discussed your Fifth Amendment rights with Mr. Gausnell?

THE WITNESS: No, sir.

MR. GAUSNELL: I didn't specifically discuss the Fifth Amendment. I told him about the possibility—

THE COURT: You have admitted to leaving the scene of an accident, admitted to a dozen driving violations, enough to probably put you in the penitentiary.

MR. GAUSNELL: Your Honor, at this point, he has not admitted to any driving offenses.

THE COURT: He admitted to hitting a car and leaving the scene of an accident. He admitted to running two stop signs.

MR. GAUSNELL: That's all he has admitted to.

THE COURT: Brace yourself, counsel. I think he's admitted to a great deal more.

I need to appraise you that you have the right to remain silent, and criminal charges may be filed against you in regard to your testimony under oath. I need to advise you you may need an attorney. I think you are in serious trouble.

MR. GAUSNELL: Can I have a recess at this point?

THE COURT: We can take a recess, if you want.

(The jury being admonished by the Court, court was declared in recess, during which recess the following proceedings were had out of the presence and hearing of the jury:)

MR. GAUSNELL: Your Honor, at this point, Mr. Staggs would like to exercise his Fifth Amendment rights.

MR. SUMMERS: Judge, on behalf of the State, we are going to request that all his testimony be stricken from the record and disregarded by the jury.

THE COURT: You understand that you have already testified under oath. It's a little late. You can't withdraw what has been testified to. Do you want to stop? Are you telling me you wish to stop or do you wish to retract your statement?

(Discussion was held off the record.)

THE COURT: I want to visit with him.

(An off-the-record discussion was had in chambers between the Court and the witness Staggs.)

(The following proceedings were had at the bench, out of the presence and hearing of the jury:)

MR. GAUSNELL: Your Honor, I need to make a record.

THE COURT: All right.

MR. GAUSNELL: At this point, Your Honor, I need to make a record of the fact that I have instructed—I have talked with Mr. Staggs. I did indicate to him, though I didn't use the words 'Fifth Amendment rights,' that certain charges, such as perjury, such as leaving the scene of an accident—

THE COURT: Wait a minute. Maybe we do need him, because that was not his statement to me. Come over here, son.

MR. GAUSNELL: I will start over so Mr. Staggs can hear this. Earlier in the morning, before this all started, I talked to Mr. Staggs. Then, at that time, I, though I didn't use the words 'Fifth Amendment,' I did indicate to him the possibility of certain charges being brought against him: perjury, leaving the scene, and maybe some traffic violations. And then I advised him to what I thought the outcome could be on those, and though I don't have the duty to represent him because I am representing Linton Jacobs, I did advise him that he—

THE COURT: Is that consistent with your position?

THE WITNESS: Yes.

MR. GAUSNELL: I would also like to state on the record that the Judge did talk to Mr. Staggs off the record, which was over my objection at that point.

THE COURT: When did you object?

MR. GAUSNELL: I asked if I could go into the room.

THE COURT: No, you didn't. Nancy[1] asked if she could.

MR. GAUSNELL: I asked if I could make a record and you said 'off the record.'

THE COURT: I don't think that's correct.

MRS. NARROW: I asked to make a record of what he was advised of now.

THE COURT: That's what I was going to do. I advised this gentleman neither of you attorneys represented him, that he, at this time, was without representation before this Court, and that he should be very aware that he, if he felt the need, should have an attorney of his own to protect him and no one else.

I advised him what Nancy's position was and what your position was and his relative rights. Is that correct?

THE WITNESS: Yes, sir.

THE COURT: I advised him to say nothing back to me. When I started, I said, 'I want no response from you whatsoever. I simply want you to listen to what I have to say.'

I advised him, in my opinion at this point, he needed to be represented by an attorney if he proceeded with things that were, in fact, not so. If what he said was so, he could stand on the truth and, if so, the truth would protect him.

Is that not what I said, son?

THE WITNESS: Yes, sir.

THE COURT: And I advised him that he needed to understand that your interests were to protect your client and, at this point in time, he had no attorney in this courtroom. Is that basically the substance of our conversation?

THE WITNESS: Yes, sir.

THE COURT: I advised him, basically of his rights, which I think he needed to be advised of.

Is there anything you want on record?

MR. GAUSNELL: No, Your Honor.

(The following proceedings were had within the presence and hearing of the jury:)

THE COURT: Do you want me to announce to the jury his decision at this point?

MR. GAUSNELL: That's fine, Your Honor.

THE COURT: Ladies and gentlemen of the jury, there will be no further testimony from this young man. He has raised his Fifth Amendment rights to further testimony and, thus, at this point, there will be no more testimony unless counsel wish to address that question.

MR. GAUSNELL: No, Your Honor.

MR. SUMMERS: No, sir.

THE COURT: You may stand down.

MR. SUMMERS: The State would request that due to his rights that his testimony—

MR. GAUSNELL: Your Honor, could we approach the bench for this request?

THE COURT: Yes, sir.

(Counsel approached the bench and the following proceedings were had out of the hearing of the jury:)

MR. SUMMERS: The State is going to request that Mr. Staggs' testimony be stricken from the record and that the jury be admonished that they cannot consider any part of his testimony in their deliberations because he has now invoked his Fifth Amendment rights.

We have not had an opportunity to fully cross-examine him on what he has already testified to, and we don't know what we might have been able to get into if we continued with it. He has placed us in a position now of having testified under direct to what he wanted to testify to and not

---

1. Nancy Narrow is a public defender and was evidently co-counsel for Jacobs.

allowed us to complete our cross-examination.

THE COURT: What's your position to that? Is that a fair position to take? I stopped his cross-examination.

I think I have no alternative but to strike.

MR. GAUSNELL: I object.

THE COURT: On what grounds?

MR. GAUSNELL: Well, due to the fact that he didn't—he never admitted to changing his position either way.

THE COURT: I have stopped his cross-examination. I have frozen his position. He cannot cross-examine now. When he was beginning to tear the man to pieces, I stopped it. I have not been fair to the State.

MR. GAUSNELL: Your Honor—

THE COURT: For the record, gentlemen, I am not real sure what the answer is. I had not thought of that. But I have, in fact, stopped the State from cross-examining your witness. I have allowed your witness to say his piece and then freeze everything with the Fifth Amendment. I have no alternative but to order his testimony stricken.

Are you aware of any alternatives? Have you any suggestions?

MR. GAUSNELL: No, sir.

MR. SUMMERS: Off the record—

THE COURT: Let's stay on the record. I am going to let the testimony stand as it is, and I will cut the cards in favor of the defendant against the State.

In its brief filed here, the state has not cited any case that approves of a trial judge holding ex parte off-the-record conferences with material witnesses during the course of a jury trial. The Canons of Judicial Ethics expressly prohibit such conduct. *See* Rule 2, Canons 2A and 3(A)(4) V.A.M.R. The reasons for the prohibition of such judicial behavior are obvious. Ex parte off-the-record conferences during trial between the judge and a material witness gives the appearance of a star chamber proceeding, and leaves the impression in a jury case that the judge believes, or does not believe, the testimony of a witness, thus influencing the deliberations of the jury. Any such appearance of partiality on the part of the trial judge should be avoided. *State v. Green*, 613 S.W.2d 182, 183 (Mo.App.1981).

■ The standard for determining if the trial court has acted improperly, in cases of this type, is whether the trial court's conduct is such as to prejudice the minds of the jury against the defendant thereby depriving him of a fair and impartial trial. Whether there was prejudice depends on the context and words in each case. *State v. Puckett*, 611 S.W.2d 242, 244 (Mo.App. 1980).

■ While we have no way of knowing what the trial judge said to the material witness in the privacy of the judge's chambers, since no witnesses were present and no record was made, we do know that immediately after that conversation, the witness declined to testify further, and that fact was communicated to the jury. This prevented defense counsel from rehabilitating his witness through redirect examination, and could have left the jury with the impression that what Staggs said to the judge in private, or vice versa, caused Staggs to wonder if he should stick to his story.

Especially troubling in this case is the fact that Jacobs and his attorney were not accorded an opportunity to be present during the judicial interrogation. In fact, the record indicates that an attorney's attempt to be present on Jacobs' behalf was rebuffed. A defendant has an inherent right to be present at every material stage of his trial. *State v. McCrary*, 365 Mo. 799, 287 S.W.2d 785, 787 (1956). The trial court's interruption of the testimony of Jacobs' principal witness, followed by an in camera off-the-record interrogation of that witness, followed by a declaration by the witness that he declined to testify further, was certainly a material stage of the trial. We hold that the trial court's conduct, in the instance referred to above, constituted prejudicial error.

Jacobs' remaining point of alleged error is that the trial court erred in permitting the prosecuting attorney to interrogate Staggs, during cross-examination, regarding a prior municipal ordinance violation conviction for the purpose of casting doubt on Staggs' credibility as a witness. We cannot tell from the record made at trial whether the prior conviction was a criminal conviction or an ordinance violation. At any rate, we assume the error, if any, will not be repeated on retrial.

The judgment and sentence of the trial court is reversed, and the cause is remanded for a new trial.

CROW, C.J., and HOLSTEIN, J., concur.